(29 P.3d 441)

No. 85,565

BUSBY, INC., *Appellant*, v. KANSAS DEPARTMENT OF AGRICULTURE, *Appellee*.

Opinion filed August 3, 2001.

*Grant M. Glenn* and *R. Patrick Riordan*, of Woner, Glenn, Reeder & Girard, P.A., of Topeka, and *Michael V. Foust*, of Goodland, for appellant.

*Derenda J. Mitchell*, special assistant attorney general, and *M.J. Willoughby*, assistant attorney general, for appellee.

Before GREEN, P.J., KNUDSON, J., and PHILIP C. VIEUX, District Judge, assigned.

KNUDSON, J.: Busby, Inc. (Busby) appeals the district court's dismissal of its action against the Kansas Department of Agriculture (KDA). The central issue on appeal is whether K.S.A. 2-1205 is constitutional. The district court concluded Busby lacks standing to maintain its action and even if it does have standing, the statute is constitutional.

We conclude the district court erred in deciding Busby lacks standing; however, we agree K.S.A. 2-1205 is constitutional. Therefore, the decision of the district court is affirmed.

Busby is a Colorado corporation that formerly handled commercial fertilizer in Kansas and other states. In April 1994, Busby registered commercial fertilizer in Kansas. Under K.S.A. 2-1205, all individuals who have registered commercial fertilizer in Kansas must pay an inspection fee to the KDA due in January or July of the reporting year. In July 1994, Busby made a payment of $6,643.28 for inspection fees due for the January 1994 through June 1994 reporting period. Busby has not made any other payments. In October 1994, the KDA wrote Busby a letter requesting financial information for the years 1991 through 1993 in order to determine if Busby owed any fees for those years. Busby filed suit against the KDA in March 1995, alleging K.S.A. 2-1205 was unconstitutional and seeking an injunction to prevent further collection of inspection fees.

In March 1996, Busby informed the KDA it had sold most of its assets to another company. The sale included Busby's fertilizer business. After the sale, Busby was no longer engaged in the fertilizer business. In the sale, Busby retained the claim against KDA for recovery of inspection fees paid and also retained the liability to KDA for any inspection fees it might owe from past operations. At the time, the KDA indicated to Busby that "it appeared there were at least tens of thousands of dollars owing by Busby to the State of Kansas."

In April 1996, Busby filed a motion to amend its petition to include a request for certification as a class, a claim for a declaratory

judgment under K.S.A. 60-1701 *et seq.*, a claim that K.S.A. 2-1205 was unconstitutional, a claim for injunctive relief pursuant to K.S.A. 60-907, and a claim for refund of all payments made pursuant to K.S.A. 2-1205. The KDA opposed Busby's motion to amend and sought dismissal of the case. The district court dismissed the case for lack of subject matter jurisdiction. It found Busby failed to make a timely claim under the Kansas Judicial Review Act, (KJRA), K.S.A. 77-601 *et seq.*

In *Busby, Inc. v. Kansas Department of Agriculture*, No. 78,499, an unpublished opinion filed April 23, 1999, a panel of this court reversed the district court, holding that an attack upon the constitutionality of a statute is not tantamount to review of agency action and the KJRA is not the exclusive remedy available to Busby. The Court of Appeals also addressed the issue of standing. It held that since Busby, by contract, remained liable for any past due fees, it had standing to pursue the claim.

On remand, the district court granted Busby's motion to amend. In March 2000, the KDA filed a motion to dismiss Busby's amended petition. The district court granted the motion to dismiss in June 2000. It found Busby had no standing to challenge the constitutionality of K.S.A. 2-1205, and even if it did have standing, the statute was constitutional. Busby timely appeals both holdings.

## THE ISSUE OF STANDING

We need only consider the standing issue under Busby's claim for a refund of the $6,643.28 inspection fees paid in 1994. The district court found the claim was not properly before the court as the fees were paid without protest. Busby argues the district court erred because the commercial fertilizer act does not contain any procedure to seek a refund.

On appeal, the KDA relies upon *Regency Park v. City of Topeka*, 267 Kan. 465, 981 P.2d 256 (1999). In *Regency Park*, the plaintiffs sought reimbursement of stormwater utility charges that had been paid under city ordinances declared invalid. The district court, relying upon the "volunteer rule," held the payors were not entitled to reimbursement. The "volunteer rule" provides that a party who, without mistake, fraud, or duress, voluntarily pays money on a de-

mand which is not enforceable against him cannot recover amounts paid. 267 Kan. at 468.

On appeal, the Supreme Court held, *inter alia*, that the district court properly granted judgment to the City based on the volunteer rule. 267 Kan. at 473. The court reasoned that although the payors complained about the assessments, payments were made without any verbal or written statement to the City that the payors intended to demand the return of the amounts paid. 267 Kan. at 475. The court noted that it would have been helpful for the payors to have begun an action to contest the validity of the ordinance, attempted to enjoin collection, attempted to broaden the terms of the appeal provision, or to have taken any action which would have put the City on notice that the money it was collecting was in jeopardy. 267 Kan. at 476.

More recently, the Supreme Court decided *Bigs v. City of Wichita*, 271 Kan. 455, 23 P.3d 855 (2001). In *Bigs*, the appellants challenged the City of Wichita's charter ordinance permitting the assessment and collection of liquor license fees in excess of the fee allowed under state law. One issue was the standing of the license holders who had paid the license fee without protest. The court found the licensees did have standing and distinguished *Regency Park*, stating:

"We concluded in the present case that the City did not have authority to continue charging more than the statutory liquor license fees after the amendments to K.S.A. 41-2622 became effective on July 1, 1988, and thus this case presents the other side of the *Regency Park* coin. The City's charter ordinance would have been void rather than voidable and the City would have been collecting fees during the entire period for which Licensees seek refunds—from July 1, 1988, through November 28, 1995—pursuant to an ordinance that was neither valid nor binding. Thus, the *Regency Park* reasoning would not preclude refund of the liquor license fees collected under a void ordinance. Licensees cite *Salthouse v. McPherson County*, 115 Kan. 668, 224 Pac. 70 (1924), for the proposition that the volunteer rule has no application where the exaction was made without valid authority. In that case, the court stated: 'The statute under which the tax was collected has been held to be unconstitutional, being an attempt by the state to tax property which is by the federal law exempt. [Citation omitted.] The plaintiff was entitled to a return of his money unless his recovery was prevented by purely procedural considerations.' 115 Kan. at 669. After examining the various procedural considerations, the court affirmed the trial court's judgment in favor of

Salthouse. We note, however, that Salthouse made the tax payment under protest, and for that reason the payment was not voluntary. 115 Kan. at 672.

"Licensees direct the court's attention to cases from other states' courts holding that a license fee paid in order to do business is made under duress and, thus, involuntary so as to remove it from operation of the volunteer rule. They rely particularly on *Five Boro Elec. Assn. v. City of N.Y.*, 12 N.Y.2d 146, 237 N.Y.S.2d 315, 187 N.E.2d 774 (1962), in which several hundred electricians were permitted to recover excess license fees that had been paid without protest. In an earlier case, the license fees for electricians had been held to be so excessive as to be unconstitutional. Licensees also single out the case of *State ex rel. S. S. Kresge Co. v. Howard*, 357 Mo. 302, 208 S.W.2d 247 (1947), in which the Missouri court stated:

'The refund of taxes illegally exacted is ordinarily a matter of governmental grace. On grounds of public policy, the law discourages suits for the refund of taxes illegally levied and collected, and has imposed many restrictions on their recovery. It is generally held that taxes voluntarily paid without compulsion, although levied under an unconstitutional statute, cannot be refunded without the aid of a statutory remedy. [Citation omitted.]

'But here we have no general statute authorizing the refund of a domestication tax illegally exacted. Nevertheless, under the common law if the payment of a tax is deemed involuntary, a tax which is unlawfully collected may be recovered back by appropriate action. [Citation omitted.] Here we have a tax which was unlawfully collected under the express ruling of [an earlier case]. So the only question as to the common law right of relator to a refund is whether the payment of the tax was voluntary or involuntary.

'The tax was not paid under protest. Even so, that fact does not determine whether it was paid voluntarily or involuntarily and has little or no weight on the question. [Citations omitted.]

'In [an earlier case], we followed the prevailing rule that a voluntary payment of a tax made under a mistake of law but with a full knowledge of all the facts cannot be recovered. However, courts are now taking a more liberal view as to whether certain types of taxes are ever in fact voluntarily paid since the urgent and immediate payment of them is compelled in order to avoid the harsh penalties imposed for non-payment. The compulsion brought about by such penalties creates what the writers have termed technical or implied duress sufficient to make the payment of such taxes involuntary. We adopted the modern view of greater liberality in recognizing such duress in tax payments in *Brink v. Kansas City*, 355 Mo. 860, 198 S.W.2d 710, where we declined to follow the stricter view of some of our earlier decisions.

'And even more to the point in this case this court has held that the payment of a tax in order to avoid the forfeiture of the payor's right to continue in business "constituted such duress as would render the payment of the tax involuntary." [Citations omitted.] . . .

'In the instant case relator was faced with the forfeiture of its right to continue business here, and with other penalties, unless it paid the domestication tax. We hold that under these circumstances it was an involuntary payment. Being an involuntary payment of an illegal tax relator has a lawful right to have it refunded by the State.' 357 Mo. at 307-08.

"We find persuasive the reasoning of the Missouri and New York courts and accordingly conclude that a business faced with the forfeiture of its right to continue business unless it paid the fee does not pay it voluntarily. Here, the payments were involuntarily exacted pursuant to an enactment that was invalid and without effect. Thus, Licensees are entitled to a refund." *Bigs*, 271 Kan. at 469-71.

We conclude the reasoning in *Bigs* is applicable and Busby does have standing to challenge the constitutionality of K.S.A. 2-1205.

## CONSTITUTIONALITY OF STATUTE

Busby's constitutional claim is based on the allegation that, under the clear language of the statute, the inspection fee under K.S.A. 2-1205 generates revenue far in excess of the cost of the inspection program. Busby argues that because K.S.A. 2-1205 generates excessive revenues, it violates Kansas Constitution art. 11, § 1, as well as the Commerce Clause and Fourteenth Amendment of the United States Constitution. Busby also argues the statute is unconstitutionally vague.

" 'The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the constitution.' " *State ex rel. Stephan v. Parrish*, 257 Kan. 294, 297, 891 P.2d 445 (1995) (quoting *State ex rel. Schneider v. Kennedy*, 225 Kan. 13, 20, 587 P.2d 844 [1978]).

K.S.A. 2-1205 states:

"An inspection fee shall be collected upon all commercial fertilizers sold, offered or exposed for sale, or distributed in Kansas, which shall be at a rate per ton of 2,000 pounds fixed by rules and regulations adopted by the state board of agriculture, except that such rate shall not exceed $1.70 per ton of 2,000 pounds. The inspection fee rate per ton of 2,000 pounds in effect on the day preceding the effective date of this act shall continue in effect until the state board of agriculture adopts rules and regulations fixing a different inspection fee rate under this section. Each person registering any commercial fertilizer shall pay the inspection fee on such commercial fertilizer sold, offered or exposed for sale, or distributed in Kansas, and shall keep adequate records showing the tonnage of each commercial fertilizer shipped to or sold, offered or exposed for sale, or

distributed in Kansas, and the secretary, and duly authorized representatives of the secretary, shall have authority to examine such records and other pertinent records necessary to verify the statement of tonnage.

"Each person registering any commercial fertilizer shall file an affidavit semi-annually, with the secretary, within 30 days after each January 1 and each July 1, showing the tonnage of commercial fertilizer sold or distributed in Kansas for the preceding six-month period, and shall pay to the secretary the inspection fee due thereon for such six-month period, except that the registrant shall not be required to pay the inspection fee or report the tonnage of commercial fertilizers or fertilizer materials sold and shipped directly to fertilizer manufacturers or mixers, but the fertilizer manufacturers or mixers shall keep adequate records of the commercial fertilizers sold or distributed in this state, and report to the secretary the tonnage thereof and pay the inspection fee due thereon. If the affidavit is not filed and the inspection fee is not paid within the thirty-day period, or if the report of tonnage is false, the secretary may revoke the registrations filed by such person; and if the affidavit is not filed and the inspection fee is not paid within the thirty-day period, or any extension thereof granted by the secretary, a penalty of $5 per day shall be assessed against the registrant and the inspection fee and penalty shall constitute a debt and become the basis for a judgment against such person. The secretary may grant a reasonable extension of time.

"The Kansas state board of agriculture is hereby authorized and empowered to reduce the inspection fee by adopting rules and regulations under this section whenever it shall determine that the inspection fee is yielding more than is necessary for the purpose of administering the provisions of this act, and the board is hereby authorized and empowered to increase the inspection fee by adopting rules and regulations under this section when it finds that such is necessary to produce sufficient revenues for the purposes of administering the provisions of this act, but not in excess of the maximum fee prescribed by this section. The secretary shall remit all moneys received by or for the secretary under article 12 of chapter 2 of Kansas Statutes Annotated and amendments thereto to the state treasurer at least monthly. Upon receipt of any such remittance the state treasurer shall credit the remittance as follows: (1) An amount equal to $1.40 per ton shall be credited to the state water plan fund created by K.S.A. 82a-951, and amendments thereto; (2) an amount equal to $.04 per ton shall be credited to the fertilizer research fund; and (3) the remainder shall be credited to the fertilizer fee fund. All expenditures from the fertilizer fee fund shall be made in accordance with appropriation acts upon warrants of the director of accounts and reports issued pursuant to vouchers approved by the secretary of the state board of agriculture or by a person or persons designated by the secretary."

Busby alleges the statute is unconstitutionally vague because although it provides that commercial fertilizer be registered and that

each person registering any commercial fertilizer must pay the inspection fee, it does not state who must register the fertilizer.

The standard for determining whether a statute regulating business is unconstitutionally vague is a common-sense determination of fairness. If an ordinary person exercising common sense can understand and comply with the statute, it is constitutional. *Boatright v. Kansas Racing Comm'n*, 251 Kan. 240, 243, 834 P.2d 368 (1992). In determining whether an ordinance is void for vagueness, two inquiries are appropriate: (1) whether the ordinance gives fair warning to those persons potentially subject to it and (2) whether the ordinance adequately guards against arbitrary and discriminatory enforcement. *State v. Lackey*, 232 Kan. 478, 480, 657 P.2d 40 (1983). The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the constitution. In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it, and, if there is any reasonable way to construe the statute as constitutionally valid, that should be done. 232 Kan. at 479.

K.S.A. 2-1205 sufficiently warns persons of common intelligence that "[e]ach person registering any commercial fertilizer shall pay the inspection fee on such commercial fertilizer sold, offered or exposed for sale, or distributed in Kansas," and that "[a]n inspection fee shall be collected upon all commercial fertilizers sold, offered or exposed for sale, or distributed in Kansas." Thus, any person selling, offering or exposing for sale, or distributing commercial fertilizer in Kansas should be aware an inspection fee will be collected on that fertilizer. Busby argues it is unclear who must pay the fee on the commercial fertilizer as there is a chain of distribution. Here, it is undisputed Busby was merely a "middleman." KDA conceded that as a "middleman," Busby was not liable for the fee on the fertilizer because its distributor would be responsible for payment of inspection fees. The Secretary's interpretation is consistent with the language of the statute.

Although K.S.A. 2-1205 is a statute regulating business that must be afforded greater leeway than a statute proscribing criminal conduct, *Cardarella v. City of Overland Park*, 228 Kan. 698, 706, 620

P.2d 1122 (1980), a penalty is provided for violation. K.S.A. 2-1208(3). Thus, although the statute does not specifically state who must register, it is clear that if one is involved in the commercial fertilizer business, a duty is placed upon that person to ensure the fertilizer has been registered and labeled, either by the distributor from whom they obtained the fertilizer, or to determine, if it is not already registered and labeled when it is acquired, if they need to do so. When construed in its entirety, there is no room for guessing by people of common intelligence as to the statute's requirements. We conclude the statute is not unconstitutionally vague.

Busby also argues the fee imposed by K.S.A. 2-1205 violates the Commerce Clause of the United States Constitution, art. 1, § 8, cl. 3. Kansas may properly legislate the regulation of fertilizers as Congress has not acted in this area and the legislation is predominately a local influence on interstate commerce. See *Morgan v. Virginia*, 328 U.S. 373, 378-79, 90 L. Ed. 1317, 66 S. Ct. 1050 (1946). An analysis of a state's role in regulating interstate commerce necessarily involves making a determination as to whether the state's legislation only incidentally burdens interstate commerce or whether the legislation affirmatively discriminates against interstate commerce. Statutes in the first group violate the Commerce Clause only if the burden imposed on interstate trade is excessive in relation to the putative local benefits. *Maine v. Taylor*, 477 U.S. 131, 138, 91 L. Ed. 2d 110, 106 S. Ct. 2440 (1986). Here, there is no allegation nor evidence of affirmative discrimination against interstate commerce.

Busby's argument hinges on the amount of fee imposed. It argues the fee is disproportionate to the costs of maintaining the inspection program and the revenue obtained from the fees are improperly used for other state purposes. The main complaint from Busby is that a portion of the funds derived from the fees go to the State Water Fund. This argument is without legal merit. The portion of the fees which contribute to the State Water Fund also goes toward the program's purpose: The State Water Fund is designed to protect the State's most precious natural resource which is threatened by the use of fertilizers. Thus, the contribution is

fairly related to the regulation of fertilizers and is not excessive to the local benefits conferred on the state of Kansas.

An inspection statute which does not yield excess revenue over costs and does not provide that the fee be placed in the state's general fund is not a revenue raising measure. *R. B. Enterprises, Inc. v. State*, 242 Kan. 241, 248-49, 747 P.2d 152 (1987). Here, it is clear the funds derived from the inspection fee are not placed in the general fund, are not a revenue raising measure, and are used for the purposes for which the program exists: to regulate the use of fertilizers which necessarily involves the protection of resources threatened by fertilizer use.

Finally, Busby claims the fee is a specific property tax and that it is an impermissible tax on inventories, both violative of Kansas Constitution art. 11, § 1(b). With respect to the claim the fee is an impermissible tax on inventories, it has been previously noted the fee is not a disguised tax as Busby alleges.

Busby's other claim is that the fee is a "specific tax" as discussed in *Von Ruden v. Miller*, 231 Kan. 1, 642 P.2d 91 (1982). However, a specific property tax, although perhaps fixed by some sort of weight or measurement, is still a property tax. The *Von Ruden* court discussed property taxes as falling into two categories: ad valorem and specific. 231 Kan. at 9. Merely because the fee in this instance is based on a measurement of tonnage sold does not make it a specific property tax. The specific taxes discussed in *Von Ruden*, and the cases cited therein, established that a specific property tax need not be based on property owned; however, it is clear that a property tax is a tax on property owned or revenues obtained from property owned. See *Von Ruden*, 231 Kan. at 8-9. The fee here is based on the tonnage of fertilizer sold, which funds the regulation of the product sold. Thus, it is not a specific property tax, nor a tax at all. It is a fee for the purposes of supporting the regulation of fertilizer for the health, safety, and welfare of Kansas citizens.

Affirmed.